IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

WESTERN DISTRICT—PITTSBURG 1871.

### Letzkus *versus* Butler.

1. Letzkus gave his negotiable note to a company. Butler as holder sued him on it. Letzkus gave evidence that the note had been given for stock in the company, at the solicitation of Butler, who was a director and a leading man in the company, and on condition that Letzkus should be superintendent. Stock was transferred to him by Butler, and he was employed as superintendent at $1000 for six months and discharged in two and a half months, for which time he was paid wages. *Held*, to be no defence to the note.

2. Under the Act of May 11th 1871, the Supreme Court will reduce their opinions to writing only in cases of reversal, and in such cases of affirmance as shall be deemed by a majority of the court sufficiently important.

3. When a judgment is pronounced with an opinion "PER CURIAM," it will imply that elucidation and argument are not required in the particular case.

October 2d 1871. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the District Court of *Allegheny county:* No. 13, to October and November Term 1870.

This was an action of assumpsit, brought January 13th 1869, by J. G. Butler, Jr., against John Letzkus.

On the trial, November 17th 1869, before Kirkpatrick, J., the plaintiff gave in evidence the following note, with protest, the plaintiff being the holder, and rested:—

"$1000.                        "Youngstown, O., Dec. 6th, 1867.

"One year after date, I promise to pay to the order of Youngstown Nut and Washer Company one thousand dollars, at Wick, Bros. & Co., with interest. Value received.

                                                "JOHN LETZKUS."

[Letzkus *v.* Butler.]

(Endorsed.)

" Pay Lake Superior Nut and Washer Company, or order.
"YOUNGSTÒWN NUT AND WASHER CO.
"By W. H. WICK.

" The Lake Superior Nut and Washer Company.
"By J. G. BUTLER, Jr., Treas.

" Pay James Ward & Co., or order.
"J. G. BUTLER, Jr., JAMES WARD & Co.,
WM. H. BROWN, JAMES WARD & Co."

The defendant testified :—" I was working at Youngstown Roll-
ing Mill; Mr. Butler and others were about starting a Nut and
Washer Company; I told some friends if I had the money, I
would like to take an interest; in a week or ten days after I was
introduced to plaintiff; he said he would like to have me in the com-
pany, as he thought I understood the business ; told him I had
no money to go at that time ; he said he could fix matters up
afterwards. As I was coming home, met Butler in the cars ; he
said, 'if you give me your note I will advance the money for the
amount of stock you take ;' told·him I would not take over $1000.
He then stated he wanted me to go in. He wanted me to super-
intend and take charge of business ; told him on them conditions
I would go in ; also told him I was inventing machinery, and
would like to have them go in and be tried ; he said it should be
done. This is about all that happened in the cars. Afterwards
met him, and we arranged matters to get me to go along to New
Haven to see machinery. Went there with Butler and Wick ; they
bought machinery on my judgment. Butler, Wick and others got
company started. They held meetings ; Butler leading man.
Discussed matters ; wages fixed on Butler's motion, at the rate
of $1000 for six months. I gave note before they fixed my
wages, but on representation of Butler, that I was to be superin-
tendent and test my machinery. He fixed no time ; was to get
stock from company ; Butler to advance the money ; I neither got
stock from company, nor certificate from Butler. Saw on books
of company $1000 of Butler's stock transferred to me. Asked
for certificates of stock ; never got them. Have asked Butler for
certificates ; never got them from him. Went to work as superin-
tendent ; worked about two months and a half, when I was discharged
by company. Attended more than my time. Worked all day, and
at night. Had started men on my patents. My invention was not
tested by the company. Never got any consideration for my note.
Got and earned my wages. Lost my place there. My wages were
paid in cash. Pay of wages began 1st January 1868. I gave a lien
on the stock transferred to me on books of company to Mr. Butler,
plaintiff. I was a director in Youngstown company. I attended some
of the meetings. Company had power to discharge me or any one.

[Letzkus *v.* Butler.]

The agreement as to the introduction of my machinery was made with Youngstown Nut and Washer Company some four to six weeks after I had given the note. The bargain I made with the company was different from the bargain I made with J. G. Butler, Jr."

The defendant requested the court to charge the jury:—

1. That under the evidence in this case, if they believe the same, the defendant is entitled to a verdict.

2. That if the jury believe that the plaintiff was aware of all the facts as proved by the witness, then he is not an innocent holder of said note for value received, and defendant is entitled to a set-off for all the loss he has sustained by reason of the failure of the said Youngstown Nut and Washer Company to comply with the contract on which said note was given.

The court refused both points, and instructed the jury that the plaintiff was entitled to recover. The jury found for the plaintiff $1118.49.

The defendant took out a writ of error, and assigned for error the answers to his points and the instruction of the court.

*J. J. Mitchell* and *R. Woods*, for plaintiff in error, cited Swain *v.* Ettling, 8 Casey 486.

*J. S.* and *A. P. Morrison*, for defendant in error.

The opinion of the court was delivered, October 16th 1871, by

THOMPSON, C. J.—In this case we are all of opinion that there was sufficient testimony to justify the instructions of the learned judge to the jury, and the instructions themselves were unexceptionable. The judgment must therefore be affirmed.

In this connection we have a matter of practice which we wish to state for the information of the profession, and as explanatory of the course which we may, to some extent, pursue in regard to a class of cases that we often meet with in the discharge of our official duties. It is this:—

By the Act of the General Assembly, approved the 11th of May 1871, entitled an Act "relative to the opinions of the Supreme Court," the 2d section of the Act of 6th of March 1812, requiring "the judges of the Supreme Court to give their opinions on every point and exception taken and signed in the inferior courts," was repealed, and the law so modified as to require the judges of the said court "to give their opinions in writing and file the same of record, upon any point on which a judgment of reversal shall be entered, and in such other cases as the majority of the said judges shall deem of sufficient importance to require their opinions to be reduced to writing and filed of record."

By this act an unnecessary burthen has been removed from this

[Letzkus *v.* Butler.]

court, and one which in fact had become well nigh impossible of performance, consistently with the duty of the court to the despatch of business constantly pressing within any reasonable time. Indeed it may well be doubted, whether the requirements of the Act of 1812 were not always an evil instead of a benefit to the law. It involved the necessity of stating and restating in writing, settled principles as often as they occurred, no matter how often that may have been done in preceding cases. In this way a principle was in danger of losing its identity, solely by iteration and attrition, or on the other hand of becoming too expanded for want of care in stating it with precision. This is a mischief to be avoided as far as possible, and it may be done by the exercise of a sound discrimination, as to whether well known principles ought to be discussed or stated anew. The present act gives some latitude as to this.

But beyond this, the change in the law provided by the act, will enable the court to pronounce its judgment in a majority of cases, without much delay, and this will afford them more time to devote to the examination and discussion of those of more importance or novelty of principle. The labors of this court, heretofore enhanced by the requirements of the repealed section, and actually performed by it, I fully believe, have been greater than that of any court of the last resort, Federal or State, in the Union. The new act affords some relief without a possible injury to the law. It expresses a trust in the Supreme Court, which has final jurisdiction in cases of life, liberty and property, in the less grave responsibility of determining when and where it is most proper and fit that its opinions shall be written, filed and published. This is the case almost everywhere else out of this Commonwealth. No danger that this duty will not be faithfully performed if other duties have been. A desire for the confidence and approval of the profession, and the public, will always be a sufficiently impelling motive to judges, to make known the reasons for their decisions, in cases of anything like general importance or principle.

The new Act of Assembly will also be a relief to the professors of the law, in diminishing the number of volumes of reports they must annually buy.

The legislature possibly may have had some reference to this as a purpose of the law in the correction made. They doubtless knew how enormous had been the increase of reports within the last few years, and the burthen upon them, of keeping up with the increase. I do not mean our state reports alone, but these, with the reports of other states which every lawyer endeavors, as far as he can, to have in his library. It was, therefore, an economic consideration not unworthy of legislative attention. There is no doubt but the profession of the law has always, and ever will, require more of its own literature than any, I might

[Letzkus *v.* Butler.]

almost say, all other professions together. New developments of principles from new pursuits, ought and will always be made public through reports. They are of infinite value to progress and to civilization itself. The publication, however, of all that emanates from any and every court, important and unimportant, increases books without always improving the law. The body of reports emanating annually from the press in this country is almost illimitable. A contrast with this is forcibly brought to my mind by recurring to a remark of an old writer, the name of whom I do not remember. Speaking of the Year Books, which were semi-official reports, he said that when these publications were discontinued in the reign of Henry VIII. it was because it was thought enough reports of decisions had been published to establish the law of the kingdom for all possible cases which might arise in future. A great mistake this, indeed. At this day, there are more than ten times the number of volumes of reports published annually, than were the whole number of volumes of the Year Books, from and including Edward II. to the reign of Henry VIII. This is only curious in contrasting those times with the present. We must and ought to have reports—reports confined to important principles—but not of everything said or done in the courts. That is not necessary or useful.

Notwithstanding the change of the law on this subject by the Act of Assembly mentioned, it still remains the duty of the judges of this court, to determine in every case, whether more than a short, or *per curiam* opinion is necessary or beneficial to the law involved in the case. When, therefore, a judgment is so pronounced, it will imply an opinion previously entertained, that the law is so well settled, that argument and elucidation are not needed in the particular case.

A further requirement will be noticed in the act: namely, to file opinions in every case of the reversal of a judgment, upon the point or points of which such reversal is predicated. This not only for the correction of the mistakes made in the law of the case, but to stand as a guide in the re-trial of the same case in the inferior court. If no new trial be awarded on the reversal of the judgment, the opinion will, as in all cases, be a precedent in similar cases, and exhibit what the law was which has ended the controversy between the parties. With this modification of the Act of 1812, labor enough, and more than enough, remains to be done to employ all the time that health and strength will permit the judges in discharging their duties to the public. Thus much we have thought it proper to say as explanatory of the change which may take place to some extent in the matter of filing opinions under the new, instead of the old law.